USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED:  5/22/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JUHUA HAN,

                              Plaintiff,

               v.

KUNI'S CORPORATION *doing business as*
IKINARI STEAK USA AND PEPPER
FOOD SERVICE CO. LTD.,

                              Defendants.

---

No. 19-CV-6265 (RA)

<u>OPINION & ORDER</u>

RONNIE ABRAMS, United States District Judge:

Plaintiff Juhua Han filed this action against Defendants Kuni's Corporation d/b/a Ikinari Steak USA ("Kuni's") and Pepper Food Service Co. Ltd. ("PFS"), asserting claims for discrimination on the basis of her sex, race, national origin, and immigration status under Title VII of the Civil Rights Act of 1964; the Equal Pay Act of 1963; 42 U.S.C. § 1981; the New York State Human Rights Law; the New York City Human Rights Law; and the New York Equal Pay Act. Now before the Court is Defendant PFS's motion to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[1]  For the reasons that follow, the motion is granted.

---

[1] Defendant Kuni's answered Plaintiff's Complaint on September 30, 2019, *see* Dkt. 16, and does not join in this motion.

## BACKGROUND[2]

### I.    Factual Background

### A.  Plaintiff's Employment at Ikinari Steak

Plaintiff is a "female individual of Chinese descent" who was employed at Ikinari Steak, a restaurant located in Manhattan, New York, from approximately July 15, 2017 to July 26, 2018.[3] Compl. ¶¶ 16, 18.  In response to an advertisement, Plaintiff applied and received an interview for a "Restaurant Manager" position at Ikinari Steak.  *See id.* ¶¶ 19-21.  According to Plaintiff, "Defendants refer[] to restaurant managers as 'General Manager[s].'"  *Id.* ¶ 22 n.4.

On May 19, 2017, Takashi Tsuchiyama, "the President of Kuni's Corporation and a board director of [PFS]," interviewed Plaintiff for the position.  *Id.* ¶ 22.  Plaintiff alleges that Tsuchiyama was "charged" by Kunio Ichinose—PFS's founder, President, Chief Executive Officer, and "Representative Director," *see id.* ¶¶ 26, 34—to "operate the Ikinari Steak chain stateside."  *Id.* ¶ 34.  During the interview, Tsuchiyama apparently "discussed Defendants' plan to open up 11 stores in New York," told Plaintiff that PFS "had an ambitious plan to expand the Ikinari Steak chain to the United States," and "inquired about Plaintiff's prior experience in the hospitality industry."  *Id.* ¶¶ 24, 33.  Following this interview, Tsuchiyama recommended Plaintiff to Ichinose for a "second interview."  *Id.* ¶ 26.  Plaintiff asserts that, about two weeks later, she met with Ichinose for an interview at JFK airport.  *Id.* ¶ 27.  She alleges that Ichinose hired her at the end of that meeting, specifically by "saying to her 'You are hired.'"  *Id.*  She also asserts that Ichinose made "the final hiring decision" with respect to her employment.  *Id.* ¶ 34.

---

[2] The following facts are drawn from Plaintiff's Complaint, Dkt. 1 ("Compl."), and are assumed to be true for the purpose of resolving this motion.  *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).

[3] Although Plaintiff's Complaint states that she was employed at Ikinari Steak "from on or about July 15, 2019 to July 26, 2018," the Court assumes that Plaintiff intended to write "July 15, 2017 to July 26, 2018," not "July 15, 2019 to July 26, 2018."  *See also* PFS Mot., Dkt. 36, at 2 & n.1.

Nonetheless, Plaintiff alleges that Tsuchiyama "chaired the recruitment process of [her]," *id.* ¶ 34, and subsequently extended her a "formal offer of employment" over a telephone call, *id.* ¶ 28. During this call, Tsuchiyama allegedly told Plaintiff that she would begin her employment with "a three-month probationary period as an Assistant Kitchen Staff with a pay rate of twenty dollars ($20) per hour," after which she would be employed in "a full General Manager position with an annual salary in the range from [$100,000] to [$150,000] per year." *Id.* Plaintiff asserts, however, that she then received an offer letter, dated May 30, 2017, which had "drastically different terms" than had been discussed on the call. *Id.* ¶ 29. Specifically, Plaintiff contends that the offer letter provided for her employment in "the non-exempt position of 'Assistant Kitchen Manager' at $20 per hour." *Id.* According to Plaintiff, when she asked Tsuchiyama about "the disparate terms of the offer letter," he explained that "given the nascent stage of the company, Assistant Kitchen/Floor/Cook Managers are the only available positions; and that the company endorses an everybody-has-to-do-everything entrepreneurial culture." *Id.* ¶ 30; *see also id.* ¶ 33 ("Plaintiff was told by Takashi Tsuchiyama . . . that as Kuni's Corporation was a new and growing company in the U.S., she would help build the corporate infrastructure.").[4] Tsuchiyama also allegedly "assured Plaintiff of company's [sic] commitment of promoting her as General Manager after the probation period and that it was the company's policy and practice of requiring all new hires to go through a three-month probationary period." *Id.* ¶ 30.

Plaintiff asserts that she accepted the employment offer on June 13, 2017 "[b]ased on Takashi Tsuchiyama's representations and assurances." *Id.* ¶ 31. She also maintains that she had "five years' experience working at managerial positions in the hospitality industry" prior to joining

---

[4] Based on allegations like these and others, it appears that when Plaintiff refers to "the company" in her Complaint, she is referring to Kuni's, i.e., Ikinari Steak.

Ikinari Steak.  *Id.* ¶ 17.  According to Plaintiff, Tsuchiyama and Inoue Toru, "the Operating Manager,"[5] were her supervisors throughout her employment.  *Id.* ¶ 35.

### B. Allegations of Discrimination

Plaintiff alleges that, despite her "good performance" as an employee, "Defendants discriminated against [her] on the basis of sex, race, national origin, and/or immigration status." *Id.* ¶ 56.  She contends that Defendants "preferred" male, Japanese employees and/or American citizens over her, and specifically that Defendants hired men as General Managers even though they "were less experienced and [less] qualified than her."  *See id.* ¶ 64.  At some point, Tsuchiyama also allegedly told Plaintiff that "they are only going to hire managers that are Japanese Males or American citizens."  *Id.* ¶ 65.  She asserts further that she was "passed over for less experienced male employees," *id.* ¶ 66, that "managerial positions [were] closed off to her," *id.* at ¶ 76, and that she was "not being considered for a promotion simply because she was not an American Citizen or Japanese Male," *id.* ¶ 67.  She also contends "[u]pon information and belief" that "all male employees in the company [were] regularly promoted within approximately two (2) months of hiring or were outright hired at higher positions than Plaintiff regardless of experience," *id.* ¶ 68, and that "the only woman in a higher position in the company was a Japanese woman," *id.* ¶ 69. Plaintiff maintains that she "perform[ed] work substantially equal to that of her male counterparts, but that she [was] paid substantially less."  *Id.* ¶ 76.

In approximately September 2017, for instance, Plaintiff apparently "discovered that two male employees doing the same work as she were receiving higher compensation then [sic] she was and did not have to go through a probationary period when they were first hired."  *Id.* ¶ 36.

---

[5] Plaintiff does not specify whether Toru is the Operating Manager at Kuni's or PFS, but based on other allegations in the Complaint, it appears that Toru worked at Kuni's, i.e., Ikinari Steak.

In particular, she alleges that one male employee was employed as a "Cook Assistant Manager" and was "earning a salary of [$80,000]," and that a second male employee was employed as an "Assistant Floor Manager" and was "receiving a salary of [$52,000]." *Id.* ¶ 37.  According to Plaintiff, both of these employees "performed the same job duties as [she]," even though they held different job titles, and both were "promoted to the General Manager position a few months after commencing employment, even though they lacked comparable experience in the hospitality industry as [she]." *Id.*  Plaintiff asserts that she was "disturbed by the fact that there was a great disparity between her pay and those of her male counterparts," and therefore complained to Tsuchiyama about this "unfair treatment." *Id.* ¶¶ 38, 42.  Upon asking Tsuchiyama "why she was getting a different salary than males performing the same jobs" and expressing "that it was unfair and not equal opportunity to pay her differently than her male counterparts," Tsuchiyama allegedly responded by stating that "it was not her business how he paid salaries to his employees." *Id.* ¶¶ 43-45.  Plaintiff also alleges that in October 2017, "the company hired four males as General Managers with a salary of [$63,000] per year," and asserts that "[s]ome" of these "new hires" "did not have previous experience as a general manager." *Id.* ¶¶ 61-62.

According to Plaintiff, at the end of September 2017, Tsuchiyama informed her that she would be getting a raise of an "an additional five dollars ($5.00) per hour," effective October 1st, 2017.[6] *Id.* ¶¶ 39-40.  She contends that Tsuchiyama also "denied [the] salary assurances [he had] made to Plaintiff at the time of hiring." *Id.* ¶ 46.  Plaintiff alleges that she "sent an email to Headquarters of [PFS] in Japan to inform them of this problem," but that PFS did not respond to

---

[6] Although the Complaint states that Plaintiff's raise would be "effective October 1st, 2018," *see id.* ¶ 39, the Court assumes that Plaintiff intended to write "October 1st, 2017."

her email.[7]  *Id.* ¶ 47.  Plaintiff also alleges that "[t]wo weeks later," she was informed by Yaginuma Kastutoshi, an "Operating Manager,"[8] that "if she would not accept a salary of twenty-five dollars ($25.00) per hour, she should leave the company."  *Id.* ¶ 48.  She allegedly discussed "her concerns" with Yoshimi Tsuda, "the Human Resources Manager,"[9] who told Plaintiff that "the company did not feel obligated to follow through on its promises to Plaintiff because of [her] 'visa situation.'"  *Id.* ¶¶ 49-50.  Tsuda also apparently told Plaintiff that "because of her visa status[,] she would not easily be able to leave this job and that she therefore had to do any assignments given to her and at the rate of pay offered to her."  *Id.* ¶ 57.

Plaintiff contends that she accepted the offer for a salary of $25 per hour "because she was concerned about losing her job and losing immigration status."  *Id.* ¶ 51.  Upon accepting this salary increase, Plaintiff's job title changed to "Operating Specialist."  *Id.* ¶ 52.  She asserts that even though her job title was "Operating Specialist," her "job duties were largely aligned with those of a General Manager."  *Id.* ¶ 53.  In particular, Plaintiff maintains that her job duties included "train[ing] management in business operations including how to make work schedules, calculate labor costs, and manage supply chain," *id.*, and "train[ing] Human Resources managers in personnel matters including hiring and firing and conducting interviews," *id.* ¶ 54.

Plaintiff also alleges generally that Defendants engaged in an "intentional segregation" of women, non-citizens, and "Chinese people" into "lower paying, less prestigious, and less desirable

---

[7] While Plaintiff alleges that she emailed PFS to inform them of "this problem," it is unclear whether the problem to which she is referring is the problem of her "male counterparts" receiving higher salaries than she, the problem of Tsuchiyama not honoring his alleged "salary assurances" made to her at the time she was hired, or both.

[8] Again, Plaintiff does not specify whether Kastutoshi is an "Operating Manager" at Kuni's or PFS.  However, PFS refers to Kastutoshi as "Kuni's Operating Manager," *see* PFS Mot. at 4, and Plaintiff does not contest that label in her opposition.

[9] Plaintiff does not specify whether Tsuda is the Human Resources Manager at Kuni's or PFS, but PFS refers to Tsuda as "Kuni's Human Resources Manager," *see* PFS Mot. at 4, a label that Plaintiff again does not dispute.

positions," *id.* ¶ 77-79, and that as to her in particular, "Defendants willfully took advantage of [her] immigration status," *id.* ¶ 60.  She asserts that, in addition to her regular assignments, she was "often pushed to do unrelated job assignments like clerical support of the Human Resources department, drafting job descriptions, working as an interpreter of Japanese and English, serving food, and managing kitchen staff."  *Id.* ¶ 58.  Plaintiff asserts further, "[u]pon information and belief," that as of August 2017, she was "the only employee who was not issued a laptop by the company and had to bring her own laptop to work."  *Id.* ¶ 59.

### C. Plaintiff's Constructive Discharge

In May 2018, an individual named Hideki Kawano replaced Tsuchiyama as the President of Kuni's.  *See id.* ¶ 73.  Plaintiff asserts that she sent an email to Kawano regarding "her treatment," *id.*, but that this email went "unanswered," *id.* ¶ 74.  According to Plaintiff, however, she subsequently spoke to Kawano "individually," and during that conversation, Kawano "offered Plaintiff an annual salary of $55,000."  *Id.*

Nonetheless, Plaintiff alleges that she was ultimately "forced to resign employment at the company" in light of "Defendants' intentional discriminatory policies and practices."  *Id.* ¶ 82.  She alleges further that, "[a]s a consequence of her constructive discharge, she became ineligible for company salary, growth, and benefits."  *Id.* ¶ 83.  Plaintiff's employment at Ikinari Steak ended on approximately July 26, 2018.  *See id.* ¶ 18.

### D. Relationship Between PFS and Kuni's

According to the Complaint, PFS is the Japan-based parent company of Kuni's Corporation, as well as a "SEC-registered foreign issuer whose shares are trading on NASDAQ coded 'KPFS.'"  *Id.* ¶¶ 2, 14.  Kuni's, a domestic corporation incorporated in Delaware and doing business as "Ikinari Steak USA," is a wholly-owned subsidiary of PFS.  *Id.* ¶¶ 4, 11, 15.  According

to Plaintiff, PFS operates Ikinari Steak, a "restaurant chain that has over 300 locations throughout Japan," and Kuni's operates "11 locations throughout Manhattan." *Id.* ¶¶ 3-4.

Plaintiff asserts that PFS and Kuni's operate as a "single integrated enterprise with respect to the operations of Ikinari Steak restaurants." *See id.* ¶ 33.[10]  As support for this contention, she alleges that Takashi Tsuchiyama—the President of Kuni's and a board director of PFS, *id.* ¶ 22— told her that PFS "had an ambitious plan to expand the Ikinari Steak chain to the United States," and that "as Kuni's Corporation was a new and growing company in the U.S., [Plaintiff] would help build the corporate infrastructure." *Id.* ¶ 33.  Plaintiff also alleges that PFS and Kuni's have "overlapping ownership and interrelated operations," *id.* ¶ 34, and that Tsuchiyama "has ownership interests" in both Kuni's and PFS, *id.* ¶ 23.  In further support, Plaintiff alleges that Kunio Ichinose interviewed and ultimately hired her for her job at Ikinari Steak, *id.* ¶¶ 27, 34, and that Ichinose is the founder, President, CEO, and Representative Director of PFS, *id.* ¶¶ 26, 34.  According to PFS's publicly filed Form 6-K, dated March 7, 2019, Ichinose is also a Director of Kuni's Corporation.  *See* Saruyama Decl. Ex. A, Dkt. 34-1, at 3.[11]

## II.    Procedural History

In May 2018, Plaintiff retained the law firm Hang & Associates PLLC in connection with her charge of discrimination filed with the Equal Employment Opportunity Commission ("EEOC").  *See* Affirmation of Ge Qu, Dkt. 40-1, ¶ 2.  On May 23, 2018, Ge Qu—an associate at

---

[10] In paragraph 33, Plaintiff states, "Corporate defendants constitute a single integrated enterprise with respect to the operations of Ikinari Steak restaurants." *Id.* ¶ 33.  Although Plaintiff does not define "corporate defendants," the Court assumes she means both PFS and Kuni's.

[11] The Court may take judicial notice of documents publicly filed with the SEC, *see Citadel Equity Fund Ltd. v. Aquila, Inc.*, 168 F. App'x 474, 476 (2d Cir. 2006), and may "consider any . . . legally required public disclosure document[] filed with the SEC" on a motion to dismiss, *see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  PFS has included an excerpt of the March 7, 2019 Form 6-K as an exhibit attached to the Declaration of Hiroto Saruyama, *see* Saruyama Decl. Ex. A, Dkt. 34-1, and the full publicly filed document can be found at https://sec report/Document/0001193125-19-066247/.

Hang & Associates PLLC and Plaintiff's counsel of record in this action—filed a notice of appearance before the EEOC on behalf of the law firm.  *See id.* ¶ 3.  On approximately June 7, 2018, Plaintiff filed her charge with the EEOC.  *See* Affidavit of Juhua Han, Dkt. 40-2, ¶ 2.  The EEOC issued Plaintiff a Notice of Right to Sue on May 13, 2019.  *See* Compl. ¶ 6.

Plaintiff filed this action on July 5, 2019.  *See* Dkt. 1.  Following unsuccessful efforts to mediate,[12] Defendant PFS filed a motion to dismiss the complaint on February 24, 2020.  *See* Dkt. 33.  Plaintiff filed her opposition on February 28, 2020, *see* Dkt. 40, and PFS replied on March 16, 2020, *see* Dkt. 43.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  On a Rule 12(b)(6) motion, the question is "not whether [the plaintiff] will ultimately prevail," but "whether [her] complaint [is] sufficient to cross the federal court's threshold."  *Skinner v. Switzer*, 562 U.S. 521, 529-30 (2011) (citation omitted).  In answering this question, the Court must "accept[] all factual allegations as true, but 'giv[e] no effect to legal conclusions

---

[12] This action was automatically referred to mediation upon Defendant Kuni's filing of its answer on September 30, 2019.  *See* Dkts. 16, 18.  PFS participated in the mediation subject to a Stipulation and Order that provided, among other things, that PFS did not "waive, and will not be deemed to have waived, any of its objections to the complaint under Fed. R. Civ. P. 12, including with respect to service of process, jurisdiction, or any other procedural or substantive defense which may be available to it."  *See* Dkt. 20 ¶ 2.

couched as factual allegations.'" *Stadnick*, 861 F.3d at 35 (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)).  Moreover, on a motion to dismiss, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns*, 493 F.3d at 98.

## DISCUSSION

Throughout her Complaint, Plaintiff refers repeatedly to "Defendants" collectively—and sometimes just to "the company"—as her employer.  Although it appears that her references to "the company" are to Kuni's Corporation, and not PFS, *see, e.g.*, Compl. ¶ 30 (referring to Tsuchiyama's comments about the "nascent stage of the company"); *id.* ¶ 33 (referring to Tsuchiyama's comments that "Kuni's Corporation was a new and growing company"), Plaintiff nonetheless asserts that PFS and Kuni's were, together, her employer as a "single integrated enterprise."  *See id.* ¶ 33.  PFS now moves to the dismiss the complaint, under both Rule 12(b)(1) and Rule 12(b)(6), on the basis that Plaintiff has failed to plausibly allege that PFS is her "employer" under the relevant federal, state, and local statutes.[13]

---

[13] Although PFS moves to dismiss under both Rules 12(b)(1) and 12(b)(6), noting that "[s]ome courts in this district have analyzed the issue of whether or not a defendant is the plaintiff's employer as a challenge to this Court's subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), . . . while other courts have analyzed the issue under a Fed. R. Civ. P. 12(b)(6) motion for failure to state a claim," *see* PFS Mot. 7, the Court finds—particularly in light of the Second Circuit's decision in *Da Silva v. Kinsho Int'l Corp.*, 229 F. 3d 358 (2d Cir. 2000)—that this argument is properly raised on a 12(b)(6) motion to dismiss, as opposed to a 12(b)(1) motion.  In *Da Silva*, the Court of Appeals held that Title VII's definition of "employer," which includes a fifteen-employee minimum, was not jurisdictional.  *Da Silva*, 229 F.3d at 366.  The court noted that "[s]ubject matter jurisdiction in federal-question cases is sometimes erroneously conflated with a plaintiff's need and ability to prove the defendant bound by the federal law asserted as a predicate for relief—a merits-related determination," *id.* at 361, and concluded that, as long as the plaintiff makes a "non-frivolous claim," a dispute over whether a federal statute is applicable in the first place goes to the merits of the case and not the court's subject matter jurisdiction, *id.* at 365-66.  By "endeavor[ing] to plead that an employer covered by Title VII has violated its prohibition," a plaintiff has sufficiently invoked a federal court's subject matter jurisdiction, and a plaintiff's "ultimate failure to prove single employer status," for instance, "is not a ground for dismissing for lack of subject matter jurisdiction."  *Id.* at 365.  As district courts have since concluded, *Da Silva*'s construction "permits

**I.      Whether the Complaint Plausibly Alleges that PFS is Plaintiff's "Employer"**

Plaintiff asserts discrimination claims against both Defendants under a host of federal, state, and local statutes: Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000-e, *et seq.* ("Title VII"); the Equal Pay Act, 29 U.S.C. § 206(d); the Civil Rights Act of 1991, 42 U.S.C. § 1981 ("Section 1981"); the New York Equal Pay Act, N.Y. Lab. Law § 194; the New York State Human Rights Law ("NYSHRL"); and the New York City Human Rights Law ("NYCHRL").

To state a claim for relief against PFS under any of these statutes, Plaintiff must plausibly allege that PFS was her employer.  *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) ("Title VII makes it unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'") (quoting 42 U.S.C. § 2000e-2(a)(1)); *Kairam v. West Side GI, LLC*, 793 F. App'x 23, 25-26 (2d Cir. 2019) ("The [Equal Pay Act] 'prohibits employers from discriminating among employees on the basis of sex by paying higher wages to employees of the opposite sex for 'equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'") (quoting 29 U.S.C. § 206(d)(1)) (other citation omitted); *Patterson v. Cty. of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004) ("[Section 1981] outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment[.]");[14] *see also*

---

defendants to challenge employer status on a motion for summary judgment, or on a Rule 12(b)(6) motion," but only "on a Rule 12(b)(1) motion if the plaintiff's claim appears 'frivolous or plainly insubstantial.'"  *See, e.g.*, *Darden v. DaimlerChrysler N. Am. Holding Corp.*, 191 F. Supp. 2d 382, 392-93 (S.D.N.Y. 2002) (citation omitted).  As the Court is not prepared to conclude, at this point, that Plaintiff's naming PFS as a defendant in this action was "frivolous or plainly insubstantial," it will proceed by analyzing PFS's motion to dismiss under Rule 12(b)(6).

[14] Although Section 1981 "applies to a broader range of relationships than just that of employer and employee," *see Brathwaite v. Sec. Indus. Automation Corp.*, No. 06 CV 0300 (ERK) (JMA), 2006 WL 8439237, at *5 (E.D.N.Y. Dec.

*Brown v. Daikin Am. Inc.*, 756 F.3d 219, 225-26, 226 n.7 (2d Cir. 2014) (noting that "[t]he NYSHRL mirrors [Title VII's] federal obligations" and thus analyzing NYSHRL claims "in tandem" with those brought under Title VII); *Alvarracin v. Volume Servs., Inc.*, No. 17-cv-3873 (PKC), 2018 WL 2452766, at *2 (S.D.N.Y. May 30, 2018) ("The NYCHRL makes it unlawful for employers to discriminate on the basis of age, race, color, national origin or gender, among other characteristics."); *Lehman v. Bergmann Assocs., Inc.*, 11 F. Supp. 3d 408, 420 n.6 (W.D.N.Y. 2014) ("New York's Equal Pay Act is analyzed under the same standards applicable to the federal Equal Pay Act.").

Plaintiff does not dispute that PFS was not her direct employer. She maintains, however, that PFS may be held liable for the alleged discrimination because PFS and Kuni's constitute a "single employer." *See* Pl. Opp'n, Dkt. 40, at 8, 11.

As a general matter, "[t]he law allows a corporation to organize so as to isolate liabilities among separate entities," and therefore "only treats the employees of a corporate entity as the employees of a related entity under extraordinary circumstances." *See Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996); *see also Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 155 (2d Cir. 2014) (explaining that courts "may look past the formal separation among corporate affiliates when 'extraordinary circumstances' permit treating a parent and a subsidiary as a 'single employer' for the purposes of applicable statutes") (quoting *Murray*, 74 F.3d at 404). In the employment

---

1, 2006), to hold a non-employer liable for discrimination under Section 1981, the plaintiff must allege "some affirmative link to causally connect the actor with the discriminatory action." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) (citation omitted); *see also Patterson*, 375 F.3d at 229 ("[P]ersonal liability under section 1981 must be predicated on the actor's personal involvement.") (quoting *Whidbee*, 223 F.3d at 75); *Azkour v. Haouzi*, No. 11-cv-5780 (RJS), 2017 WL 3016942, at *7 (S.D.N.Y. July 17, 2017) ("[I]ndividual liability exists under Section 1981 only where a defendant actually participated in the conduct giving rise to a discrimination claim.") (alterations, internal quotation marks, and citation omitted); *see also Darden*, 191 F. Supp. 2d at 396 (explaining, in the context of a Section 1981 claim brought against related corporate entities, that "[v]icarious liability and respondeat superior theories provide no substitute for the essential element of intentional discrimination," and that "a corporation cannot be held liable for the actions of another, separate company merely because it has an ownership interest in it") (internal quotation marks and citations omitted).

discrimination context, however, "[t]here is a strong presumption that a parent is not the employer of its subsidiary's employees." *See Fenner v. News Corp.*, No. 09 Civ. 09832 (LGS), 2013 WL 6244156, at \*9 (S.D.N.Y. Dec. 2, 2013).  Accordingly, "[t]o prevail in an employment action against a defendant who is not the plaintiff's direct employer, the plaintiff must establish that the defendant is part of an 'integrated enterprise' with the employer, thus making one liable for the illegal acts of the other." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 341 (2d Cir. 2000) (quoting *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995)).

"A 'single employer' situation exists 'where two nominally separate entities are actually part of a single integrated enterprise,'" *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005) (citation omitted), such as where "the plaintiff is an employee of a wholly-owned corporate subsidiary" or where "the plaintiff's employment is subcontracted by one employer to another, formally distinct, entity." *See Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 378 (2d Cir. 2006).  As such, "a parent company is considered an 'employer' of its subsidiary's employees only when the parent and subsidiary represent a single, integrated enterprise." *Shukla v. Viacom Inc.*, No. 18 Civ. 3522 (PAE), 2019 WL 1932568, at \*6 (S.D.N.Y. May 1, 2019); *see also Fenner*, 2013 WL 6244156, at \*9 ("Under the single employer doctrine the court examines whether a parent and subsidiary are so integrated that in effect they are acting as one with respect to the plaintiff's employment.").  "Where two entities are deemed part of a single integrated enterprise, then both entities are subject to joint liability for employment-related acts." *Lima v. Addeco*, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009), *aff'd,* 375 F. App'x 54 (2d Cir. 2010) (internal quotation marks and citation omitted).[15]

---

[15] In contrast to the "single employer" doctrine, "[i]n a 'joint employer' relationship . . . 'there is no single integrated enterprise.'" *Arculeo*, 425 F.3d at 198 (quoting *Clinton's Ditch Coop. Co. v. NLRB*, 778 F.2d 132, 137 (2d Cir. 1985)). "A conclusion that employers are 'joint' assumes that they are separate legal entities, but that they . . . handle certain

The Second Circuit has articulated a "four-factor test" to determine "whether, under Title VII, a parent and subsidiary constitute a single employer." *Turley*, 774 F.3d at 155-56. Under this test, "a parent and subsidiary cannot be found to represent a single, integrated enterprise in the absence of evidence of (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Id.* at 156 (quoting *Brown*, 756 F.3d at 226). "Although no one factor controls the analysis, the second, 'centralized control of labor relations,' is the most significant." *Id.* (citing *Cook*, 69 F.3d at 1240-41); *see also Murray*, 74 F.3d at 405 (explaining that "the policy underlying the single employer doctrine" is "most implicated where one entity actually had control over the labor relations of the other entity, and, thus, bears direct responsibility for the alleged wrong"); *Stinson v. City Univ. of N.Y.*, No. 17-cv-3949 (KBF), 2018 WL 2727886, at *9 (S.D.N.Y. June 6, 2018) ("The Second Circuit has placed particular emphasis on the second factor, focusing on the entity that made final decisions regarding employment matters related to discrimination."). The Second Circuit has also recognized that "[t]he third and fourth factors—common management and common ownership—are, in particular, ordinary aspects of the parent-subsidiary relationship, which often may be of limited use in determining whether to treat two or more corporate affiliates as a single employer." *See Turley*, 774 F.3d at 156 n.4 (internal quotation marks and citation omitted). Indeed, the critical question in the inquiry is "[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?" *See Brown*, 756 F.3d at 227 (quoting *Cook*, 69 F.3d at 1240).

---

aspects of their employer-employee relationship jointly." *Id.* "Where this doctrine is operative, an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violations of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer." *Id.* Because Plaintiff does not contend that PFS and Kuni's were in a "joint employer" relationship, as opposed to a "single employer" relationship, the Court need not address whether the Complaint plausibly alleges such a joint relationship.

14

Courts have applied this same four-factor test to determine whether two or more entities constitute a "single employer" under Section 1981, the NYSHRL, and the NYCHRL.  *See, e.g.*, *Turley*, 774 F.3d at 156 (applying "the same four-factor inquiry to determine whether two or more entities constitute a 'single employer' under the [NYSHRL]"); *Ruiz v. New Avon LLC*, No. 18-CV-9033 (VSB), 2019 WL 4601847, at *12-13 (S.D.N.Y. Sept. 22, 2019) (applying the same four-factor test to NYSHRL and NYCHRL claims); *Shukla*, 2019 WL 1932568, at *6 (applying the same four-factor test to claims brought under Section 1981, the NYSHRL, and the NYCHRL).[16] The case law regarding what constitutes a "single employer" under the Equal Pay Act and the New York Equal Pay Act is sparse, but, as PFS points out, at least some district courts have indicated that the same four-factor test applies to those claims as well.  *See Brower-Coad v. Fundamental Brokers, Inc.*, 856 F. Supp. 147, 150 n.6 (S.D.N.Y. 1993) (noting that "[d]ecisions of the district courts indicate that the identical standard governs determinations of single employer status under the Equal Pay Act, 29 U.S.C. § 206(d)" as under Title VII).  As Plaintiff has not given any indication that a different standard applies to her federal or state Equal Pay Act claims, the Court will apply the same four-factor test to all of Plaintiff's claims against PFS.

Moreover, "[t]o satisfy the single-employer test, a plaintiff need not allege that the parent exercises 'total control or ultimate authority over hiring decisions,' so long as [she] alleges that there is 'an amount of participation by the parent that is sufficient and necessary to the total employment process.'"  *Brown*, 756 F.3d at 227 (quoting *Cook*, 69 F.3d at 1241) (alterations omitted).  Nevertheless, the plaintiff "must do more than simply state legal conclusions and recite

---

[16] While the Second Circuit has noted that it has not expressly applied Title VII's four-factor "single employer" test to claims brought under Section 1981, it nonetheless implicitly sanctioned its use in the latter context.  *See Turley*, 774 F.3d at 155 n.13.  District courts in this Circuit, as well as other courts in other circuits, have likewise applied the four-factor test to Section 1981 claims.  *See, e.g.*, *Shukla*, 2019 WL 1932568, at *6; *Johnson v. Crown Enters., Inc.*, 398 F. 3d 339, 343 (5th Cir. 2005); *Reilly v. TXU Corp.*, No. 3:05-CV-0081-M, 2009 WL 857598, at *2 (N.D. Tex. Mar. 31, 2009).

the elements of the 'single employer' standard to survive a motion to dismiss." *Fried v. LVI Servs., Inc.*, No. 10 Civ. 9308 (JSR), 2011 WL 2119748, at \*5 (S.D.N.Y. May 23, 2011). And "[a]lthough the determination of whether two related entities are sufficiently integrated to be treated as a single employer is generally a question of fact, . . . where a plaintiff's allegations are so inadequate that they fail to put a defendant on notice of the theory of employer liability, dismissal is appropriate." *Ruiz*, 2019 WL 4601847, at \*13 (alterations, internal quotation marks, and citation omitted); *see also Stinson*, 2018 WL 2727886, at \*9 ("Indeed, where the four [] factors are not adequately alleged in the pleadings, courts have ruled that the plaintiff[] may not pursue the single integrated employer theory.").

Here, Plaintiff contends that "all four factors weigh[] in favor of finding single employer status" between PFS and Kuni's. *See* Pl. Opp'n at 8. The Court disagrees.

### A. Interrelation of Operations

First, Plaintiff's allegations as to the interrelation of operations between PFS and Kuni's are entirely conclusory. She alleges merely that the two entities have "overlapping ownership and interrelated operations," Compl. ¶ 34, and that they "constitute a single integrated enterprise with respect to the operations of Ikinari Steak restaurants," *id.* ¶ 33; *see also* Pl. Opp'n at 8. Aside from asserting that PFS "had an ambitious plan to expand the Ikinari Steak chain to the United States," Compl. ¶ 33, however, the Complaint does not contain any details about how the operations of the two companies are "interrelated." In analyzing this prong, courts consider factors such as: "(1) whether the parent was involved directly in the subsidiary's daily decisions relating to production, distribution, marketing, and advertising; (2) whether the two entities shared employees, services, records and equipment; (3) whether the entities commingled bank accounts, accounts receivable, inventories, and credit lines; (4) whether the parent maintained the subsidiary's books; (5) whether

the parent issued the subsidiary's paychecks; and (6) whether the parent prepared and filed the subsidiary's tax returns." *See Schade v. Coty, Inc.*, No. 00 Civ. 1568 (JGK), 2001 WL 709258, at *7 (S.D.N.Y. June 25, 2001) (quoting *Herman v. Blockbuster Entm't Grp.*, 18 F. Supp. 2d 304, 309 (S.D.N.Y. 1998)); *see also Fenner*, 2013 WL 6244156, at *9.  The Complaint, however, does not allege that PFS was involved in Kuni's daily decisions; that PFS and Kuni's share employees, services, records, equipment, or bank accounts; or that PFS maintains Kuni's books, issues Kuni's paychecks, or prepares or files Kuni's tax returns.  Plaintiff's conclusory allegations that the two companies have "overlapping ownership," "interrelated operations," or a shared plan of expansion, *see* Compl. ¶¶ 33-34, are insufficient.  *See also Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (noting that courts are "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions") (internal quotation marks and citation omitted).

### B. Centralized Control of Labor Relations

Second, Plaintiff has not plausibly alleged a "centralized control of labor relations." Although the Complaint asserts that "Defendants maintained a centralized control of labor relations," *see* Compl. ¶ 34, Plaintiff does not provide sufficient details to support that sole allegation.  As noted above, the Second Circuit has found this factor to be "the most significant" in the four-factor analysis.  *See Turley*, 774 F.3d at 156.  To determine whether there is a centralized control of labor relations, courts consider factors such as "whether the subsidiary has a separate human resource department, whether the subsidiary establishes its own policies and makes it[s] own decisions as to the hiring, discipline, and termination of its employees, whether employment applications are sent to the parent, whether the subsidiary must clear all major employment decisions with the parent, and whether the parent routinely shifts employees between the two companies."  *Schade*, 2001 WL 709258, at *8 (internal quotation marks and citations

17

omitted).  The Complaint does not include any allegations as to these factors.  Plaintiff instead seems to rely entirely on the dual roles of Tsuchiyama and Ichinose to support her assertion that PFS and Kuni's maintained a centralized control of labor relations.  In particular, Plaintiff asserts that Ichinose, the CEO and President of PFS, interviewed and ultimately hired her for the job at Ikinari Steak.  *See* Compl. ¶ 34; Pl. Opp'n at 8.  She also places weight on the fact that Tsuchiyama was both Kuni's President and a board director of PFS, and that he had some type of "ownership interest[]" in both entities.  *See* Compl. ¶¶ 22-23; Pl. Opp'n at 8.

It is a "well established principle of corporate law that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership."  *United States v. Bestfoods*, 524 U.S. 51, 69 (1998) (alterations, internal quotation marks, and citation omitted); *see also Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 57 (2d Cir. 1988) ("[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts."); *Fenner*, 2013 WL 6244156, at *11 ("The presumption is that 'corporate personalities remain distinct' and 'that directors and officers holding positions with a parent and its subsidiary can and do change hats to represent the two corporations separately, despite their common ownership.'") (quoting *Bestfoods*, 524 U.S. at 69).  Indeed, the mere fact that an executive acts in a "dual role" in both the parent and the subsidiary corporations is insufficient, without more, to "demonstrate that [the parent] exercised control over [the plaintiff's] employment."  *See Fenner*, 2013 WL 6244156, at *11.

These principles are especially pertinent to the instant motion.  Aside from interviewing Plaintiff and stating "You are hired," the Complaint does not include any other factual allegations about Ichinose.  Nor does the Complaint include allegations that he—or any other PFS executive

18

or employee—was involved in the day-to-day terms or conditions of Plaintiff's employment.[17]

Ichinose, a director of Kuni's, very well may have been acting in his capacity as an official of

Kuni's when he interviewed and "hired" Plaintiff for her job at Kuni's.[18]   Indeed, the Complaint

is devoid of allegations demonstrating that, in that one instance of interviewing Plaintiff at JFK

airport, Ichinose was acting in his role as an executive of PFS.   While Plaintiff asserts in her

opposition that Ichinose "flew from Japan to interview [her] upon the recommendation of

Tsuchiyama," *see* Pl. Opp'n at 8, nowhere in the Complaint does Plaintiff actually allege why

Ichinose came to the United States at that time, or that his sole purpose of "fl[ying] from Japan"

was "to interview Plaintiff."  And Plaintiff does not plead that Ichinose was involved in any other

aspect of her employment or the alleged discrimination at issue in this case.   The allegation that

Ichinose interviewed Plaintiff, and even that he stated "You are hired," is thus insufficient to show

that PFS and Kuni's maintained a centralized control of labor relations.   *See Balut v. Loral Elec.

Sys.*, 988 F. Supp. 339, 346 (S.D.N.Y. 1997), *aff'd,* 166 F.3d 1199 (2d Cir. 1998) (rejecting

plaintiff's claim that there was a centralized control of labor relations even though the evidence

suggested that the president of the parent corporation had "interviewed and offered [plaintiff]

employment").

---

[17] That the email Plaintiff allegedly sent to PFS headquarters, complaining of the problem she was having at Ikinari Steak, was left unanswered, *see* Compl. ¶ 47, supports the inference that PFS was not actually involved in the daily conditions of her employment or the alleged discrimination she suffered.

[18] As mentioned earlier, that Ichinose is a board director of Kuni's Corporation is evident based on PFS's public filings with the SEC, which the Court may properly consider on this motion.  *See* Saruyama Decl. Ex. A at 3; *Citadel Equity Fund*, 168 F. App'x at 476; *ATSI Commc'ns*, 493 F.3d at 98.   Although Plaintiff generally takes issue with the Declaration of Hiroto Saruyama, and devotes a section of her opposition to arguing that "the Court should disregard Hiroto Saruyama's Declaration," *see* Pl. Opp'n at 9-10, she nevertheless cites to certain portions of the Saruyama Declaration that, in her view, support her position. But Plaintiff takes these statements out of context, and also appears to misquote them.  *Compare* Pl. Opp'n at 9 ("PFS often time assigns its employees to Kuni's.") (citing Saruyama Decl. ¶ 8), *with* Saruyama Decl. ¶ 8 ("Like many global companies, PFS at times assigns its employees to work at PFS's foreign subsidiaries as expatriates on a temporary basis.").   In any event, the Court will not consider facts outside of the Complaint on this motion, including those in the Saruyama Declaration.   It notes, however, that Plaintiff's Complaint is devoid of many of the factual assertions made in her opposition, such as that  "PFS will inspect the Kuni's books from time to time," or that "PFS often time assigns its employees to Kuni's."  *See* Pl. Opp'n at 9.

In fact, elsewhere throughout the Complaint, Plaintiff asserts that Tsuchiyama "chaired the recruitment process of [her]," Compl. ¶ 34, and that it was Tsuchiyama, not Ichinose, who conveyed her official employment offer—both verbally and in writing. *See id.* ¶¶ 28-29; *see also id.* ¶ 28 ("Satisfied with her prior experience and qualifications, following the interview, Takashi Tsuchiyama extended a formal offer of employment to Plaintiff[.]").  Plaintiff also alleges that Tsuchiyama determined her compensation, *see id.* ¶¶ 28-29, 39, served as her supervisor, *id.* ¶ 35, and that Plaintiff turned to him in the first instance with respect to her complaints about the alleged discrimination, *see, e.g.*, *id.* ¶ 38.  But Tsuchiyama's alleged dual role—as both the President of Kuni's and a director of PFS—likewise does not show that PFS and Kuni's maintained a centralized control of labor relations.  Plaintiff does not plead that any of Tsuchiyama's actions during the course of her employment—including hiring her, supervising her, responding to her complaints, and determining her compensation and opportunities for promotion—were taken in his capacity as a PFS board director, and the allegations in the Complaint do not support such an inference.  The mere allegation that Tsuchiyama was a PFS director is therefore also insufficient. *See, e.g.*, *Brathwaite*, 2006 WL 8439237, at *4 (finding that the fact that "NYSE is a majority two-thirds owner of SIAC and exercises some control over its management and operations," and that "NYSE's COO is also the chairman and CEO of SIAC" are "insufficient to support the claims against NYSE, principally because they do not indicate a centralized control over SIAC's labor relations or an involvement with the alleged discrimination").[19]

---

[19] In her opposition, Plaintiff also asserts that "[i]t is common that PFS and Kuni's exchange employees."  *See* Pl. Opp'n at 6-7.  But she did not actually allege that PFS and Kuni's "exchange employees"—let alone that this practice is common—in her Complaint.  And even if she did, as PFS contends, "[i]t is not uncommon in a parent-subsidiary relationship to have employees of the parent be assigned to work for the subsidiary, but this fact alone is insufficient to determine that the two entities' labor relations are centralized in the absence of a showing that Tsuchiyama was acting in his capacity as PFS's director."  *See* PFS Mot. at 12; *see also, e.g.*, *Meng v. Ipanema Shoe Corp.*, 73 F. Supp. 2d 392, 403-04 (S.D.N.Y. 1999) (finding that plaintiff failed to establish "interrelation of operations or centralized control over labor relations" even though it was "clear that the [parent company's] employees loaned to [the

20

In short, the Complaint contains no factual allegations demonstrating that PFS, as opposed to Kuni's, controlled Plaintiff's employment or engaged in the actions that Plaintiff challenges, such as "falsely promising her the high salary, failing to promote her to General Manager, compensating her less than other male employees, or making comments about [her] immigration status." *See* PFS Mot. at 13-14.  Plaintiff does not allege that she was supervised by anyone at PFS, that PFS determined the terms or conditions of her employment (including her salary or opportunities for promotion), or that PFS handled her complaints of mistreatment.  Nor does the Complaint adequately plead that Tsuchiyama was acting in his capacity as a PFS director at any of the relevant times, or that Ichinose, even in interviewing Plaintiff for the job at Kuni's, was acting in his capacity as PFS's President and CEO when doing so.  Plaintiff has therefore failed to plausibly allege a centralized control of labor relations between the two companies.

### C.  Common Management

As to the third factor, "[a]s a general matter, the Court must consider evidence of common management in the light of the well established principle that directors and officers holding positions with a parent and its subsidiary can and do change hats to represent the two corporations separately, despite their common ownership."  *See Herman*, 18 F. Supp. 2d at 309 (internal quotation marks and citation omitted).  Plaintiff does not explicitly allege—or address in her opposition—that PFS and Kuni's share a common management.  To the extent that Plaintiff contends that this factor is met because of Tsuchiyama and Ichinose's "dual roles" in both companies, that argument is rejected for the reasons discussed above, and because "[t]hese

---

subsidiary] did in fact control many, if not all, of the aspects of plaintiff's employment" because there was "no evidence that these officers acted for or on behalf of [the parent company] in any capacity other than as [the subsidiary's] officers or that [the parent company] controlled [the subsidiary] through their actions").

executives' dual roles, without more, do not demonstrate that [PFS] exercised control over [Plaintiff's] employment." *See Fenner*, 2013 WL 6244156, at *11.

### D.  Common Ownership or Financial Control

Finally, it is undisputed that Kuni's is a wholly-owned subsidiary of PFS, and that therefore, there exists at least some common ownership between the two entities.  Nonetheless, "the existence of a parent-subsidiary relationship is insufficient on its own to support a finding that the two entities are a single or joint employer for purposes of Title VII." *Brathwaite*, 2006 WL 8439237, at *4; *see also Schade*, 2001 WL 709258, at *10 ("[I]n the absence of any meaningful participation by [the parent] in [the subsidiary's] employment and labor decisions, [the parent's] ownership status with respect to [the subsidiary] is insufficient to consider the entities an integrated single employer.").  Indeed, the Complaint does not contain allegations sufficiently pleading that, as its parent company, PFS exercised control over Kuni's such that *PFS* "made the final decisions regarding [Plaintiff's] employment or participated in the alleged discrimination against [her]." *See Brathwaite*, 2006 WL 8439237, at *3.  The fact that PFS is the parent company of Kuni's does not show that PFS and Kuni's operate as a "single employer" for purposes of liability.  Accordingly, Plaintiff has failed to plausibly allege that PFS and Kuni's constitute a single employer.

## II.  Plaintiff's Failure to Exhaust Administrative Remedies Under Title VII

Plaintiff's Title VII claims against PFS must also be dismissed for the separate and independent reason that she failed to exhaust her administrative remedies under Title VII with respect to PFS.  It is undisputed that Plaintiff did not name PFS in her EEOC charge.  *See* PFS Mot. at 22; Pl. Opp'n at 5.  Plaintiff, however, contends that the Court should "overlook" Plaintiff's "failure to comply with the EEOC filing requirement" because the "identity of interest exception" applies.  *See* Pl. Opp'n at 5.  The "identity of interest" exception "permits a Title VII action to proceed against [a party not named in the plaintiff's EEOC charge] where there is a clear identity

of interest between the unnamed defendant and the party named in the administrative charge." *Johnson v. Palma*, 931 F.2d 203, 209 (2d Cir. 1991). To determine whether this exception applies, courts consider four factors: (1) "whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint," (2) "whether, under the circumstances, the interests of a named party are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings," (3) "whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party," and (4) "whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party." *Id.* at 209-10 (alterations and citation omitted).

The Court concludes that application of this "limited" exception is not warranted here. *See, e.g.*, *Valenzuela v. Riverbay Corp.*, No. 06 Civ. 903 (DLC), 2007 WL 414487, at *2 (S.D.N.Y. Jan. 31, 2007) (noting the "limited" nature of the exception and declining to apply it); *Edwards v. Winfield Sec. Corp.*, No. 94 Civ. 803 (DC), 1995 WL 519998, at *2 (S.D.N.Y. Sept. 1, 1995) (same). The purpose of the identity of interest exception "is to avoid frustration of Title VII's remedial goals by accommodating plaintiffs who are not well versed in the statute's procedural formalities and requirements." *Ruiz*, 2019 WL 4601847, at *11 (citation omitted). Thus, as Plaintiff concedes, the identity of interest exception does not typically apply where an individual is represented by counsel at the time that she files her EEOC charge. *See* Pl. Opp'n at 5; *see also Ruiz*, 2019 WL 4601847, at *11 ("Courts therefore routinely decline to apply the identity of interest exception where complainants were represented by counsel familiar with the applicable law when they filed their EEOC charge.") (collecting cases). Recognizing this principle, Plaintiff asserts

that the Court should apply the exception here because she "filed her EEOC complaint *pro se*." Pl. Opp'n at 6.  Plaintiff cites paragraph 2 of the Affidavit of Juhua Han ("Han Aff."), Dkt. 40-2, and paragraphs 2 and 3 of the Affirmation of Ge Qu ("Qu Aff."), Dkt. 40-1, in support of that assertion.  But the statements in those paragraphs, made under the penalty of perjury, demonstrate that Plaintiff was indeed represented by counsel at the time that she filed her EEOC charge, even if Plaintiff physically brought the charge to the EEOC's office by herself.  *See* Qu Aff. ¶ 2 ("Ms. Han retained the services of this Firm in May 2018 with regard to her charge of discrimination filed with the Equal Employment Opportunity Commission ('EEOC')."); *id.* ¶ 3 ("On May 23, 2018, I filed a notice of appearance on behalf of this Firm before EEOC, by emailing Philip Reo, an investigator of EEOC."); Han Aff. ¶ 2 ("On or about June 7, 2018, I went to the EEOC field office and filed the complaint myself.").

In light of the fact that Plaintiff was represented by counsel when she filed her EEOC charge, and because none of the other *Johnson* factors weigh in favor of applying the identity of interest exception, the Court declines to do so here.  Accordingly, Plaintiff's Title VII claims against PFS are dismissed with prejudice for failure to exhaust administrative remedies.  *See Colquitt v. Xerox Corp.*, 546 F. App'x 26, 28 (2d Cir. 2013) ("Because [plaintiff's Title VII] claims were not administratively exhausted, and because an amendment to add factual detail to those claims would not cure this substantive flaw, the district court properly dismissed those claims without granting leave to replead.").

## CONCLUSION

For the reasons set forth above, PFS's motion to dismiss is granted in full.  The Clerk of

Court is respectfully directed to terminate the motion pending at Dkt. 33.

SO ORDERED.

Dated:   May 22, 2020
         New York, New York

_____
Ronnie Abrams
United States District Judge